IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONALD A. MILLER, and <br> JOHN W. McGUIRE, <br> <br> Plaintiffs, <br> <br> v. <br> <br> CHICAGO TRANSIT AUTHORITY, and <br> DONALD BONDS, in his individual <br> capacity, <br> <br> Defendants. | No. 17-cv-00806 <br> <br> Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Donald A. Miller and John W. McGuire bring this reverse race discrimination action against the Chicago Transit Authority ("CTA") and Donald Bonds under 42 U.S.C. § 1981, the Illinois Human Rights Act, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Before the Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). For the reasons discussed below, the Court grants defendants' motion.

**Background**

The following facts are taken from defendants' statement of undisputed material facts and attached exhibits.[1] The CTA is a municipal corporation engaged in providing public transportation services to the Chicago metropolitan area. Bonds, an African American, was vice president of vehicle maintenance at the CTA from May 2015 to June 2017 and currently serves as the chief transit officer of transit operations. McGuire, who is Caucasian, began working for the CTA in 1986. In 2013, he was promoted to general manager of bus maintenance. His last position was as

---

[1] These facts are not in dispute because plaintiffs did not file a timely response brief nor a Northern District of Illinois Local Rule 56.1 statement and did not demonstrate excusable neglect for their failure to do so. (Dkt. 146.) As such, the facts set forth in defendants' Local Rule 56.1 statement of facts are deemed admitted if supported by the record. *Curtis v. Costco Wholesale Corp.,* 807 F.3d 215, 219 (7th Cir. 2015).

mechanical officer for bus maintenance and he reported directly to Bonds. Miller, who is also Caucasian, began working for the CTA in 1985 and his last position was general manager of bus maintenance north. He reported directly to McGuire in that position. Both plaintiffs were at-will employees.

In 2014, McGuire became Miller's supervisor after Miller transferred to the department of bus maintenance as general manager. In February 2014, Miller was suspended for ten days without pay and warned that there would be further disciplinary action if there was not marked improvement in his performance in relation to implementing a system for cleaning rail cars. Miller testified that he did not believe that this discipline had anything to do with his race. In April 2015, McGuire issued Miller a written warning notifying him that he had violated three rules based on his failure to perform his duties. Again, Miller did not believe this discipline had anything to do with his race.

Miller was also disciplined for late "pullouts" at the Forest Glen CTA station in early 2016. In particular, McGuire issued Miller a written warning and a ten-day suspension. The warning indicated that it was the "final" written warning and stated that Miller's work record demonstrated a failure to perform his duties as the general manager of bus maintenance. The written warning also noted Millers' failure to attend a January 2016 meeting.

Also in 2016, other performance issues occurred in relation to the heating, ventilation, and air conditioning ("HVAC") systems on CTA buses that McGuire and Miller oversaw. During this time period, McGuire failed to inform Bonds about CTA security issues, along with other issues related to McGuire's or Miller's responsibilities. For example, in June 2016, neither Miller nor McGuire advised Bonds of an incident involving an unauthorized person on CTA property.

Undisputed evidence in the record indicates that Bonds believed McGuire did not hold the general manager under him (Miller) accountable, failed to adequately manage his projects, and failed to follow directives. Bonds made McGuire aware of his job performance issues on at least six

2

different occasions prior to McGuire's termination and warned him that if the issues continued, he may face discharge. One of these conversations took place in April 2016 concerning McGuire's failure to properly report certain bus maintenance issues gleaned from "flash meetings" he attended on Bonds' behalf.

In early July 2016, Bonds contacted human resources personnel and the chief administrative officer to discuss scheduling termination meetings for McGuire and Miller, which were eventually set for July 7, 2016. Prior to these meetings, McGuire sent Rita Kapadia, the Senior Manager of the CTA's EEO programs, an email stating that he was at the CTA headquarters and asked if she had "a couple of minutes" to meet. On a July 5, 2016, Miller sent Kapadia another email stating "I feel that I am being targeted by [Bonds]." Kapadia scheduled an EEO intake interview with McGuire for July 7, 2016 and sent him a copy of the administrative procedure for "Discrimination, Harassment, Bullying, and Retaliation Complaints" and the EEO Complaint Form.

At McGuire's July 7, 2016 termination meeting, Theresa Brown Fletcher, a human resources representative, explained to McGuire that he had a choice of being terminated or resigning. McGuire explained that he had a meeting with Kapadia later that day to discuss his EEO complaint and requested that the termination meeting be postponed until after he had met with Kapadia. McGuire resigned from the CTA later that day.

Similarly, on July 5, 2016, Miller sent Kapadia an email because he "finally felt like [he] had had enough" of Bonds "harping" at him and being "overly critical of everything he did and said." He did not mention race in this email nor elaborate on why he believed Bonds was targeting him, and admitted that he purposely kept his email "as vague as possible." Miller never communicated with Kapadia that he felt he was being discriminated against because of his race, but claims that was his "intent." Miller believed that Bonds showed racial animus toward him by asking an African American contemporary of Miller's to stay at the CTA instead of retiring, "while apparently plotting

3

and planning" Miller's termination. In any event, Miller never heard Bonds mention race when speaking about CTA employees.

At his July 7, 2016 termination meeting, Miller was advised that he could either retire or be terminated. Miller chose to be terminated. Miller never told Bonds that he made a complaint with the EEO unit or that he had reached out to Kapadia. Nevertheless, Miller believed that Bonds was aware because it "seemed especially suspicious" that he and McGuire were being terminated mere hours prior to their EEO intake interviews.

Evidence in the record further shows that Kapadia did not contact Bonds to tell him that she had set up appointments with McGuire or Miller and Bonds was not copied on the Outlook calendar invitations for those meetings. After McGuire's termination, Kapadia and another EEO staff member conducted a telephone interview with McGuire in response to comments he had made in his exit interview survey. During that interview, McGuire stated that he found it concerning that he was fired the same day that his EEO meeting was to take place. Kapadia explained that she had never shared with anyone outside of the EEO Unit that they were scheduled to meet that day.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986). When determining whether a genuine issue of material fact exists, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Hackett v. City of South Bend*, 956 F.3d 504, 507 (7th Cir. 2020). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that

there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims." *James v. Hale*, 949 F.3d 307, 315 (7th Cir. 2020).

**Discussion**

In moving for summary judgment, defendants argue that (1) plaintiffs fail to establish a prima facie case of reverse race discrimination; (2) plaintiffs fail to establish a prima facie case of retaliation; and (3) Bonds is entitled to qualified immunity.

*Reverse Race Discrimination*

Defendants assert that plaintiffs' reverse discrimination claims fail because they have not provided evidence of background circumstances demonstrating racial discrimination against Caucasian employees and are unable to rebut defendants' legitimate reasons for their termination. The Court analyzes plaintiffs' reverse discrimination claims based brought pursuant to Title VII, § 1981, and the IHRA under the same framework. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016).

Here, plaintiffs assert defendants discriminated against them because they are members of a majority group, namely, Caucasian. As with all employment discrimination cases, the ultimate issue is whether evidence permits "a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Tyburski v. City of Chicago,* 964 F.3d 590, 598 (7th Cir. 2020) (citation omitted). A plaintiff may carry this burden under the *McDonnell Douglas* burden-shifting method or by adducing evidence, that, considered as a whole, allows a reasonable factfinder to conclude that the proscribed factor caused his termination. *McDaniel v. Progress Rail Locomotive, Inc.,* 940 F.3d 360, 368 (7th Cir. 2019).

Defendants argue that plaintiffs fail under the *McDonnell Douglas* burden-shifting method. To survive summary judgment under this method of proof, for reverse discrimination claims,

plaintiffs must present evidence creating a genuine issue of material fact: (1) that the CTA has an inclination to discriminate against Caucasians or evidence that there is something "fishy" about the facts at hand; (2) they were meeting the CTA's legitimate performance expectations; (3) they suffered an adverse employment action; and (4) the CTA treated them less favorably than similarly situated individuals who are outside of their protected class. *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (citation omitted). If plaintiffs establishes these four factors, the burden shifts to the CTA to provide a legitimate, non-discriminatory reason for terminating their employment. *See id.*; *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020). If the CTA meets its burden, the burden shifts back to the plaintiffs to establish that the CTA's reasons for their termination were pretext for discrimination. *Purtue*, 963 F.3d at 602.

Considering the first element of a prima facie case of reverse race discrimination in plaintiff's favor, the available record does not indicate that the background circumstances are fishy or that Bonds or any other final decisionmaker was inclined to discriminate against Caucasians. For example, Bonds never used racially discriminatory language in his discussions with McGuire or Miller, and McGuire testified that Bonds never commented on race or indicated a racial preference when commenting about CTA employees. More importantly, both plaintiffs admitted at their depositions that they did not believe there was racial motivation behind the disciplinary actions Bonds took during the course of his supervision. In short, the record does not support an inference that the CTA "is one of those unusual employers who discriminate against the majority." *Mills v. Health Care Service Corp.*, 171 F.3d 450, 455 (7th Cir. 1999).

Furthermore, the undisputed evidence clearly indicates that the CTA had legitimate reasons for terminating plaintiffs' employment and that the CTA's reasons were not pretext for reverse race discrimination. Pretext is more than faulty reasoning or bad judgment; pretext is a lie or a phony reason. *Barnes v. Board of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). To establish pretext,

plaintiffs must identify "weaknesses, implausibilities, inconsistencies, or contradictions" in the CTA's proffered reason for their termination that a reasonable person would find unworthy of credence. *de Lima Silva v. Department of Corr.,* 917 F.3d 546, 561 (7th Cir. 2019) (citation omitted). In this context, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Robertson v. Department of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020) (citations omitted).

Miller was suspended in 2014 for inattention to duty and poor work performance and was issued a written warning in 2015 for failure to perform his work duties. In addition, there were other issues related to Miller's job performance, including the 2016 circumstances surrounding the late pullouts resulting in a written warning and ten-day suspension. As to McGuire, the record reveals several emails from Bonds in which he expressed displeasure about McGuire's work performance during the three months prior to his termination. Also, before his termination, Bonds had at least six face-to-face conversations with McGuire addressing concerns about his poor job performance, including his job performance in relation to his reporting of flash meetings.

Plaintiffs do not provide any evidence nor do they argue that the CTA's reasons for terminating their employment were implausible, inconsistent, or weak, let alone explain how the CTA's reasoning for their terminations was phony. Without more, plaintiffs have not presented evidence creating a genuine dispute of material fact that the CTA's reasoning was pretext for discrimination. Accordingly, the Court grants the CTA's motion for summary judgment as to plaintiffs' reverse race discrimination claims.

*Title VII Retaliation Claims*

Plaintiffs also claim that CTA terminated them in retaliation for their complaints about workplace discrimination. 42 U.S.C. § 2000e-3(a). To overcome summary judgment on a Title VII retaliation claim, a plaintiff must show that a reasonable jury – weighing the evidence as a whole –

could find that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a "but-for" causal connection between two. *Robertson*, 949 F.3d at 378. An activity is protected under Title VII only if it involves a complaint of discrimination specifically based on a protected characteristic, such as gender or race. *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). "Vague and obscure 'complaints' do not constitute protected activity." *Id.*

The CTA argues that neither plaintiff can establish that he engaged in protected activity and a causal connection between the protected activity and his termination. Miller points to his July 2016 internal complaint to Kapadia where he stated that he felt he was being "targeted" by Bonds. However, Miller did not explain why he thought he was being targeted. "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to establish that he engaged in a protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Miller's Title VII retaliation fails as a matter of law.

McGuire's retaliation claim fares no better. He failed to present evidence from which a reasonable jury could conclude that he would not have been terminated "but-for" his EEO complaint to Kapadia. In fact, there is no evidence in the record – direct or indirect – that Bonds was even aware McGuire had contacted the EEO Unit prior to McGuire's termination meeting. This resonates where Kapadia testified that as a matter of routine she would not advise respondents of investigations when a complaint is initially filed. Construing the evidence and all reasonable inferences in McGuire's favor, Bonds did not have actual knowledge that McGuire had engaged in protected activity when Bonds decided to terminate him. Finally, even if the timing of the termination meeting in relation to the scheduled interview with Kapadia appears suspicious, suspicious timing alone "is rarely enough to create an inference of retaliatory motive." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). Because plaintiffs do not present any

evidence of retaliatory motive, the Court grants the CTA's summary judgment motion as to plaintiffs' retaliation claims.

*Individual Capacity Claims Against Bonds*

Last, defendants assert that Bonds is entitled to qualified immunity against plaintiffs' claims against him in his individual capacity. A plaintiff can defeat a qualified immunity defense if: (1) he adequately alleged facts that, if true, would constitute a violation of a statutory or constitutional right; and (2) that right was clearly established at the time of the constitutional or statutory deprivation. *Hanson v. LeVan,* 967 F.3d 584, 592 (7th Cir. 2020). Because the evidence does not support a statutory or constitutional deprivation, Bonds is entitled to qualified immunity on the individual-capacity claims brought against him.

**Conclusion**

For the reasons discussed herein, the Court grants defendants' motion for summary judgment. [126]. Civil case terminated.

**IT IS SO ORDERED.**

DATE: 9/16/2020

Entered:  _____
SHARON JOHNSON COLEMAN
United States District Court Judge

9